J-A02041-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: DOMINIC M. HULL | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: MELISSA WILSON | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 830 WDA 2021 |

Appeal from the Order Entered July 2, 2021
In the Court of Common Pleas of Fayette County Orphans' Court at
No(s):  2621-0684

BEFORE:  OLSON, J., MURRAY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:               **FILED: FEBRUARY 9, 2022**

Melissa Wilson (Wilson) appeals the order of the Court of Common Pleas of Fayette County Orphans' Court (trial court) disposing of the remains of her son, Dominic M. Hull (decedent).  After the decedent's death, the trial court recognized his only sister, Mia N. Hull (Hull), as the decedent's next-of-kin so that she would have authority to dispose of his remains in Pennsylvania.  Wilson contends that the trial court misinterpreted the Probate, Estates and Fiduciaries Code, 20 Pa.C.S. § 305, in ruling that she and the decedent were estranged, and that the decedent intended for Hull to serve as his next-of-kin.  Wilson argues further that the trial court erred in finding there was clear and

_____

[*] Retired Senior Judge assigned to the Superior Court.

convincing evidence that the decedent was estranged from her at the time of his death. We affirm.

## I.

The decedent passed away in a fatal car crash on June 21, 2021.[1] At that time, the decedent was only 18 years old. He was survived by his mother (Wilson), his older sister (Hull), and a half-brother. The decedent's father (Eric Hull) had been killed in combat while serving in Iraq in 2003 when the decedent was one-year-old and Hull was three-years-old.

The decedent's accident occurred in Fayette County, Pennsylvania, where the decedent had been residing with Hull and the siblings' maternal grandparents. Upon the decedent's death, Hull filed a petition to determine the disposition of the decedent's remains. Hull testified that she filed the petition because the decedent was estranged from Wilson and he had expressed a desire to be buried next to his father in the Lafayette Memorial Park Cemetery. In support, Hull gave her account of the decedent's relationship with Wilson.

Hull testified that she lived with Wilson and the decedent in Fayette County until 2008, at which point the family moved to Washington County,

---

[1] The decedent's girlfriend was a passenger in the vehicle he was driving at the time of the accident and she survived the crash. She did not testify at the trial, and no evidence was introduced concerning the circumstances of the decedent's death.

Pennsylvania. In 2017, Hull and the decedent then moved with Wilson to Tennessee. They were accompanied by the decedent's step-father, Kristin Wilson.[2] Wilson soon gave birth to the decedent's half-brother.

Hull testified that while the decedent was residing with Wilson in Tennessee, he was physically and emotionally abused. In 2010, the decedent's teachers noticed bruises on his face and the decedent reportedly explained that he had been beaten with a board by his step-father. The decedent and Hull were temporarily removed from the custody of their mother and step-father and were placed in the custody of their maternal grandparents in Fayette County.[3]

Six months later, however, Wilson's custody was reinstated on appeal because the Child Protective Services Agency was unable to prove with substantial evidence the allegations of abuse. Once returned to their mother's

---

[2] The legal name of the decedent's mother at this point was Melissa Hull; she took the surname of the decedent's step-father, Kristin Wilson, upon her re-marriage in 2018.

[3] A Juvenile Hearing Master recommended in 2011 that the decedent and his sister should be placed in the care of their maternal grandparents. *See* Trial Exhibit 10 (Washington County Juvenile Court Division, Hearing Master Recommendation, 7/6/2011). The Master referred to photographic evidence showing bruises on the decedent's face and several other parts of his body, including his arms and buttocks. The Master noted that Wilson offered no explanation for how her child sustained those injuries. Rather, Wilson suggested that the photographs had been fabricated by the decedent's grandparents, and she denied that the injuries could have been inflicted by the decedent's step-father.

care, the siblings were prohibited from having contact with their maternal grandparents.

On the day of her 18th birthday in September 2018, Hull moved out of Wilson's home and relocated to Fayette County, where her maternal grandparents still resided. After she had returned to Pennsylvania, Hull remained in touch with the decedent, but she had little to no contact with Wilson. Hull claimed that she had been physically and emotionally abused in Wilson's home just as her brother had been.

Further, Hull testified that by September 2020, the decedent had dropped out of college and been kicked out of Wilson's home, forcing the decedent to live with his friends' families. With no other place to go, the decedent returned to Pennsylvania, taking with him only what he could fit into his backpack. After staying with his maternal grandparents and Hull for a few months, the decedent went back to Tennessee to gather the rest of his belongings.

During his stay with his maternal grandparents, Hull agreed to the decedent's request that Wilson be kept unaware of where he was living. The decedent feared that if she knew he was staying with his maternal grandparents, Wilson would cut off contact with him, as she had with Hull. Despite that secrecy, the decedent appeared to want to reside in Pennsylvania indefinitely. He had opened an account at a local bank, obtained a Pennsylvania driver's license and began working a full-time job. When

discussing their father, the decedent would sometimes confide to Hull that he wanted to be buried "right next to his dad." *See* Trial Transcript, 6/29/2021, at p. 34.

Hull corroborated her allegation of estrangement by introducing text messages exchanged between the decedent and Wilson a few months before the decedent's death. The text messages concerned a dispute between the decedent and Wilson over the proceeds of his father's military death benefits. The decedent had sought to obtain the funds to purchase a car, and Wilson apparently blocked him from withdrawing the funds. The decedent accused Wilson of "trying to screw [him]" and Wilson responded that the decedent should not have chosen his maternal grandparents over her. *See id.* at pp. 32-33.

The decedent's maternal grandmother, Milicia DeFabbo, took the stand and testified consistently with Hull's account regarding Wilson's conduct toward the decedent and the rest of the family. According to DeFabbo, Wilson refused to allow the decedent and Hull to see their grandparents after they moved out of their home in 2008. This lasted for about eight years until 2018 when Hull turned 18 and moved back in with them. The decedent then moved in with them in 2020 shortly after he turned 18.

After he had moved in with his maternal grandparents, the decedent explained that he had to leave Tennessee because "they told him to get out, his mother. And he wasn't wanted there anymore." Trial Transcript,

7/2/2021, at p. 11. The decedent told them further that he had been physically abused and that Wilson "was taking his money that was left from his dad to him and spending it." *Id.* DeFabbo produced a letter from December 2020 in which the decedent thanked his grandparents because "if it wasn't for [them], [he] would be homeless." *Id.* The decedent also apologized in the letter for having had no contact with them for the previous nine years.

Additionally, DeFabbo recalled a conversation she had had with the decedent the week before his fatal crash as to where he wanted to be buried:

> He came home one day and he said, I said, where were you honey? He said, I was at my daddy's grave talking to him. He said, it's so peaceful there, Grandma. And I said, did your mommy ever tell you how your daddy came to be buried there? And he said no, and I proceeded to tell him that when we went to pick the graves, where they took us, it smelled like cow manure and the property adjoining that had cows. And his mom said, this is perfect because Eric loved cows. And he said, [Grandma], if I die or get killed I want buried right beside him. And I said, Dominic please don't say that, Honey. You got your whole life ahead of you. I said, [Grandma and Grandpa] are gonna be gone long before you are, honey. He said, I'm just saying.

*Id.* at p. 14.

The decedent's maternal grandfather, Anthony DeFabbo, also testified, and he described the relationship between Wilson and the decedent as extremely strained due to financial disputes and the poor condition of his vehicle:

> He called her numerous times because that was the only car. Everything he's been driving way to get a decent is junk and all he wanted to do was buy a car and she always said that you're

not getting your money until you're 21. And he would actually get off of that phone and said, I'm hating her more every time I call her. For making me run around in junk and it's my money that my dad died for to give me.

*Id.* at p. 26.

At the trial, Wilson presented a much different account of her relationship with the decedent. She testified that she and the decedent had always been very close. Wilson denied kicking the decedent out of her home shortly before he returned to live with his maternal grandparents in Pennsylvania; she denied prohibiting the decedent from having contact with his maternal grandparents; she denied withholding funds from the decedent; and she denied having any knowledge of him being abused while he was living with her and the decedent's step-father.

Further, Wilson disputed that the decedent had planned on staying in Pennsylvania. She claimed that the decedent had informed her not long before his accident that he intended to move back to Tennessee, in large part because he wanted to live near her. Even after the decedent moved from Tennessee to Pennsylvania, he would often send Wilson gifts and holiday cards. Wilson submitted text messages exchanged between her and the decedent demonstrating their mutual affection. While they had had some arguments over the decedent's education and some financial matters, Wilson claimed the disputes had been temporary.

As to where the decedent wanted to be buried, Wilson testified that in May 2021, he had told her his preference was to be placed next to his

deceased dogs, which were located in Robbins, Tennessee. However, Wilson admitted that the last communication she had with the decedent was about five weeks before his death. Additionally, Wilson testified that if given authority, she would bury the decedent's remains on her property in Tennessee, apart from where the decedent's dogs were located. Wilson did not dispute that she had not spoken to the decedent's maternal grandparents in several years, and that they had never even been given Wilson's address.[4]

The trial court ultimately found Hull's version of events more credible than Wilson's. Accordingly, the trial court concluded that the decedent had been estranged from Wilson at the time of his death, and that the decedent had intended for Hull to dispose of his remains next to his father's plot in Pennsylvania.[5] The trial court then entered an order outlining its factual and legal findings. *See* Trial Court Opinion, 7/2/2021.

---

[4] Significantly, in text messages exchanged between Wilson and the decedent, Wilson told him, "I will never deal with those people again[.]" *See* Trial Exhibit 2. Wilson also clearly advised the decedent that she "won't tolerate the disrespect" of the decedent choosing to associate with his maternal grandparents and his sister. *Id*.

[5] The trial court gave some credence to Wilson's evidence, noting that the decedent almost certainly had "mixed emotions" toward his mother. Trial Transcript, 7/2/2021, at pp. 102-03. However, the trial court found the testimony of the decedent's maternal grandparents to be highly credible, specifically with regard to the decedent's express verbal declaration that he wanted to be buried next to his father. *See id*.

Wilson timely filed post-trial motions challenging the legal and factual grounds for the trial court's order and the motions were denied. ***See*** Trial Court Order, 7/16/2021. Wilson then timely appealed, and the trial court filed a 1925(a) opinion, further discussing the basis for its ruling in response to Wilson's appellate claims. ***See*** Trial Court Opinion, 8/31/2021, at 6-7.

As to the issue of who the decedent wanted to as his next-of-kin, the trial court explained that:

> Evidence *was* presented that the Decedent verbally expressed a contrary intent [than to have Wilson assume that role]. The Decedent's sister and grandfather both testified that the Decedent told them to bury him next to his father in LaFayette Memorial Park. The Court further notes that the Decedent's grandfather's testimony was overwhelmingly credible. The evidence showed that the Decedent had verbally expressed, explicitly and sincerely, a contrary intent that a person other than the one authorized by § 305 determine the final disposition of his remains, to wit: *whomever* would bury him in LaFayette Memorial Park.

***Id.*** at 6 (emphasis in original).

As to the issue of whether the decedent and Wilson had an "enduring estrangement," the trial court emphasized a number of facts which supported its conclusion that the standard for that statutory ground had been satisfied:

> [T]here was a physical and emotional separation from the [Decedent] by [Wilson]. And while there was certainly some affection, I find that there was, that the evidence clearly demonstrates an absence of *due* affection, trust, and regard for the [Decedent] . . . [T]he attitude that comes through to me was, 'You're my son and it's my way or the highway,' and he chose the highway, because he did not feel that he was receiving as much affection, trust, and regard as he should have received at home.

***Id.*** at 7 (emphasis in original).

The trial court went on to discuss "evidence in the form of text messages and eyewitness testimony" which revealed that the relationship between Wilson and the decedent was "at best, strained." **Id.** The trial court highlighted one particular message that Wilson had sent to the decedent which reads, "I'm glad not my problem. Got you to 18 and if [you're] not happy with me then so be it." **Id.** Additionally, the trial court found it significant that the decedent had moved hundreds of miles away from Wilson prior to his death, undercutting Wilson's claim that she and her son were emotionally close at that point. This appeal followed.[6]

## II.

## A.

Wilson first contends the trial court misapplied and misinterpreted 20 Pa.C.S. §305(a), (c) and (e) regarding the next-of-kin's authority to dispose of a decedent's remains. She argues that the trial court erred by construing the decedent's wish to be buried in Pennsylvania as an expression of "contrary intent" for someone other than Wilson to act as his next-of-kin. As to her relationship with the decedent, Wilson argues that the trial court misconstrued

---

[6] "When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the factfinder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion." **Estate of Powell**, 209 A.3d 373, 375-77 (Pa. Super. 2019). The Orphans' Court's legal conclusions, however, are reviewed *de novo*. **See id.**

the facts and relied on incorrect definitions of statutory terms describing what constitutes an "enduring estrangement."

Under the Probate, Estates and Fiduciaries Code, a decedent's remains are to be disposed of by the next-of-kin, which is defined in 20 Pa.C.S. § 305 as "[t]he spouse and relatives by blood of the deceased[.]" That statute, in turn, incorporates the laws of intestate succession to identify the order of the persons qualified to serve as a decedent's next-of-kin. *See id.* (definition of "next-of-kin"); *see also* 20 Pa.C.S. § 2103 (intestate succession statute enumerating the order of persons authorized as next-of-kin for an unmarried decedent).

Where a decedent has died intestate and without a surviving spouse, a surviving parent of the decedent would become his next-of-kin. *See id.* at § 305(c); *see also* 20 Pa.C.S. § 2103. However, another relative may be recognized as next-of-kin with authority to dispose if "the court determines that clear and convincing evidence establishes enduring estrangement, incompetence, contrary intent or waiver and agreement[.]" *Id.* at § 305(d)(1); *see also id.* at § 305(c).

"Contrary intent" is defined as "[a]n explicit and sincere expression, either verbal or written, of a decedent adult or emancipated minor prior to death and not subsequently revoked that a person other than the one authorized by this section determine the final disposition of his remains." 20 Pa.C.S. § 305(e). "Enduring estrangement" is defined as "physical and

emotional separation from the deceased at the time of death of the person authorized by this section to determine the final disposition of the decedent's remains, which has existed for a period of time that clearly demonstrates an absence of due affection, trust and regard for the deceased." ***Id.***

In this case, Wilson is indisputably the decedent's *default* next-of-kin. The trial court recognized that fact, but nevertheless designated Hull as the next-of-kin for the purpose of disposing of the decedent's remains because there was clear and convincing evidence of grounds enumerated in Section 305(d), namely, "contrary intent" and an "enduring estrangement." The record does not support Wilson's claim that the trial court misapplied the law as to either of those two independent bases for naming Hull the next-of-kin.[7]

In its opinion, the trial court cited all of the above provisions of the Probate, Estates and Fiduciaries Code. ***See*** Trial Court Opinion, 9/2/2021, at 3-4. The trial court identified facts in the record which would satisfy the applicable test for contrary intent, most notably the testimony of multiple witnesses that the decedent wanted to designate "*whomever* would bury him in LaFayette Memorial Park" as his next-of-kin. ***See*** Trial Court Opinion, 8/31/2021, at 6-7. That person is Hull, not Wilson.

---

[7] "When we review a legal conclusion based on statutory interpretation, our standard of review is *de novo* and our scope of review is plenary." ***Johnson v. Neshaminy Shore Picnic Park***, 217 A.3d 320, 323 (Pa. Super. 2019).

The trial court's discussion of the "enduring estrangement" standard also indicates that the statutory provision was correctly applied. Multiple witnesses testified that the decedent left Tennessee because Wilson kicked him out of her home. The record is replete with text messages from Wilson to the decedent in which she warned him that he would be disowned if he continued to associate with his relatives in Pennsylvania. While Wilson presented conflicting evidence tending to show that she and the decedent remained emotionally close, it was the trial court's role to weigh the evidence and determine whether Hull had satisfied the provisions of 20 Pa.C.S. § 305.

At the bench trial and in its written opinion, the trial court identified competent evidence in support of its finding that there was an enduring estrangement between the decedent and Wilson because at the time of his death, there was an "absence of due affection, trust and regard for the deceased." Pa.C.S. § 305(e). Thus, because the trial court did not misapply or misinterpret the law, Wilson's first two appellate claims have no merit.

**B.**

Wilson's final contention is that the trial court erred in finding that there was clear and convincing evidence of an enduring estrangement between her and the decedent. She asserts that the evidence of estrangement was insufficient to justify revocation of her status as next-of-kin, and that, if anything, the evidence demonstrated her ongoing love, care and affection for her son until the time of his death.

As discussed above, "enduring estrangement" is a "physical and emotional separation from the deceased at the time of death of the person authorized by this section to determine the final disposition of the decedent's remains, which has existed for a period of time that clearly demonstrates an absence of due affection, trust and regard for the deceased." 20 Pa.C.S. § 305(e). In order for testimony to satisfy the clear and convincing evidence standard, a trial court must find:

> that the witnesses . . . [are] credible; that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order; and that their testimony is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. It is not necessary that the evidence be uncontradicted provided it carries a clear conviction to the mind or carries a clear conviction of its truth.

*In re Novosielski*, 992 A.2d 89, 107 (Pa. 2010) (citation omitted); *see also In the Interest of J. M.*, 166 A.3d 408, 427 (Pa. Super. 2017) (same).

From our review of the record, we cannot find that the trial court erred in concluding there was clear and convincing evidence of an enduring estrangement between Wilson and her son. As outlined above, the trial court heard testimony from the decedent's sister and maternal grandparents, all of whom stated unequivocally that Wilson and the decedent were estranged in a manner that fits the term's definition in Section 305(e). The testimony of these witnesses was corroborated by text messages exchanged between the decedent and other members of his family, including Wilson.

- 14 -

The trial court credited evidence that the decedent either left or was kicked out of Wilson's home in Tennessee, causing the decedent to live temporarily with friends and then with his maternal grandparents in Pennsylvania. In a handwritten letter the decedent sent to his maternal grandparents, he stated that he would have been homeless were it not for their help. Ample evidence was introduced at trial concerning a number of serious financial and familial disputes the decedent had with his mother, who he had not been communicating with for five weeks preceding his death.

Although Wilson presented evidence that she and her son had always been on good terms, the trial court ultimately found Hull's contrary evidence to be more credible. On review, this Court must afford great deference to the trial court's credibility determinations. *See Estate of Powell*, 209 A.3d 373, 375-77 (Pa. Super. 2019). All reasonable inferences from the evidence must be made in favor of the prevailing party below, Hull. *See id*. Viewing the evidence in the light most favorable to Hull and considering the credibility determinations made in Hull's favor, we find no basis to disturb the trial court's findings and, thus, the order designating Hull as the decedent's next-of-kin must stand.[8]

Order affirmed.

---

[8] This Court can affirm the trial court on any valid basis appearing in the certified record. *See In re E.M.I.,* 57 A.3d 1278, 1290 n. 6 (Pa. Super. 2012).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/9/2022